# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL GAMCO, INC. , | CASE NO. 04 CV 1053 JLS (AJB) |
| Plaintiff, | **ORDER: (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT; (2) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY** |
| vs. | |
| MULTIMEDIA GAMES INC., | |
| Defendant. | (Doc. Nos. 268, 269) |

Presently before the Court is Defendant and Counter Claimant Multimedia Games, Inc.'s ("MGAM") motion for summary judgment of non-infringement (Doc. No. 269.) and motion for summary judgment of invalidity. (Doc. No. 268.) Also before the Court is Plaintiff International Gamco, Inc.'s ("Gamco") and Counter Defendant Oasis Technology, Inc.'s ("Oasis") oppositions to both motions (Doc. Nos. 293, 294), and MGAM's replies. (Doc. Nos. 314, 321.) For the reasons stated below, the Court **HEREBY GRANTS** MGAM's motion for summary judgment of non-infringement and **DENIES** MGAM's motion for summary judgment of invalidity.

//
//
//
//

**BACKGROUND**

MGAM is a publicly traded company with its principal place of business located in Austin, Texas.  (Lannert Decl. ISO MSJs, ¶ 1.)  Gamco is a gaming company with its principal place of business in Omaha, Nebraska.  The patent at issue in this case is United States Patent Number 5,324,035, filed December 1, 1992, entitled "Video Gaming System with Fixed Pool of Winning Plays and Global Pool Access."  (*See* Bjurstrom Decl. ISO MSJs, Ex. E (the "'035 Patent").)  The '035 Patent was originally rejected by the United States Patent and Trademark Office ("USPTO") for anticipation and obviousness over prior art not at issue in this case.[1] (*See* Bjurstrom Decl. ISO MSJs, Ex. F at 109-115; Passarelli Decl. ISO Opp., Ex. H at 224-25.)  During an interview with the USPTO, the Patent Examiner cited another relevant prior art, United States Patent Number 4,494,197, referred to as the "Troy" patent.  (*See* Bjurstrom Decl. ISO MSJs, Ex. F at 116-127; *see also* Passarelli Decl., Ex. H at 238-39 (hereinafter "Preliminary Amendment").)  Thereafter, Gamco submitted a Preliminary Amendment on January 10, 1994, amending each claim of the '035 Patent.  (*Id.*)  The '035 Patent issued on June 28, 1994.

In 2002, MGAM was awarded the contract to provide a central lottery system (the "Central System" or "MGAM System") for the New York State Lottery ("NYSL").  (Lannert Decl. ISO MSJs, ¶ 4.)  On May 25, 2004, Gamco filed its original complaint against MGAM for infringement of the '035 Patent based on the MGAM System for the NYSL.[2] (Doc. No. 1.)  The operative complaint, the Third Amended Complaint, was filed on January 9, 2008.  (Doc. No. 167.)  A claim construction hearing was held before this Court on January 13, 2009.  (*See* Doc. Nos. 235, 252.)

The present motions for summary judgment were filed on February 23, 2010.  (*See* Doc. Nos. 268, 269.)  Gamco filed oppositions to both motions on April 20, 2010.  (*See* Doc. Nos. 293,

---

[1] United States Patent Numbers 4,856,787 ("Itkis"), 2,148,135A ("Dickenson"), and 5,042,809 ("Richardson").

[2] On December 3, 2001, Oasis assigned all of its right, title and interest in the '035 Patent to Gamco as a result of Oasis' foreclosure.  (*See* Bjurstrom Decl. ISO MSJs, Ex. D.)  In 2003, Gamco assigned its rights, title and interests to International Game Technology ("IGT").  (*See* Passarelli Decl. ISO Opps., Ex. X; Bjurstrom Decl. ISO MSJs, Ex. O.)  Gamco, however, retained the right to bring suit against MGAM for infringement of the '035 Patent pursuant to this assignment.  (*Id.*)

1  294.)  MGAM filed its replies to both oppositions on May 13, 2010.  (*See* Doc. Nos. 314, 321.)

2  On May 25, 2010, the Court gave Gamco leave to file sur-replies to both motions for summary

3  judgment and further granted MGAM leave to respond in opposition to these sur-replies.  (Doc.

4  No. 333.)  All four briefs were timely filed.  Furthermore, with its original reply, MGAM filed

5  objections to the declarations of Gamco's expert witness under Federal Rules of Evidence 702 and

6  703 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993).  The Court thereafter

7  granted Gamco leave to respond to these objections and for MGAM to reply to Gamco's

8  opposition.  (Doc. No. 333.)  Both briefs were timely filed.  A hearing on all motions was held on

9  Thursday, July 22, 2010 and the matter was thereafter taken under submission.

10                                          **LEGAL STANDARD**

11        Federal Rule of Civil Procedure 56 permits a court to grant summary judgment where (1)

12  the moving party demonstrates the absence of a genuine issue of material fact and (2) entitlement

13  to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Material,"

14  for purposes of Rule 56, means that the fact, under governing substantive law, could affect the

15  outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v.*

16  *Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).  For a dispute to be "genuine," a reasonable jury must

17  be able to return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248.

18        The initial burden of establishing the absence of a genuine issue of material fact falls on the

19  moving party.  *Celotex*, 477 U.S. at 323.  The movant can carry his burden in two ways: (1) by

20  presenting evidence that negates an essential element of the nonmoving party's case; or (2) by

21  demonstrating that the nonmoving party "failed to make a sufficient showing on an essential

22  element of her case with respect to which she has the burden of proof."  *Id.* at 322–23.  "Disputes

23  over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec.*

24  *Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

25        Once the moving party establishes the absence of genuine issues of material fact, the

26  burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed

27  fact remains.  *Celotex*, 477 U.S. at 324.  The nonmoving party cannot oppose a properly supported

28  summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings."

1  *Anderson*, 477 U.S. at 256.  When ruling on a summary judgment motion, the court must view all

2  inferences drawn from the underlying facts in the light most favorable to the nonmoving party.

3  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

4  "Summary judgment is as appropriate in a patent case as in any other case."  *Cabot Safety*

5  *Intermediate Corp. v. Arkon Safety Equip., Inc.*, 44 F. Supp. 2d 375, 376 (D.Mass. 1999 (quoting

6  *Avia Group Int'l Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1561 (Fed. Cir. 1988)).  However, a

7  determination of infringement is a question of fact.  *Insituform Techs., Inc. v. Cat Contracting,*

8  *Inc.*, 161 F.3d 688, 692 (Fed. Cir. 1998).  Accordingly, summary judgment is proper only if the

9  court finds that "no reasonable jury could return a verdict for the nonmoving party."  *Anderson*,

10 4777 U.S. at 255; *see also Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308,

11 1318 (Fed. Cir. 2003); *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d

12 1308, 1319 (Fed. Cir. 2000).  Furthermore, a patent is presumed valid, see 35 U.S.C. § 282, so the

13 invalidity of patent claims must be proven by clear and convincing evidence.  *See Apotex USA,*

14 *Inc. v. Merck & Co., Inc.*, 254 F.3d 1031, 1036 (Fed. Cir. 2001); *WMS Gaming, Inc. v. Int'l Game*

15 *Tech*, 184 F.3d 1339, 1355 (Fed. Cir. 1999).

16                                                    **DISCUSSION**

17 **I.     Gamco's Expert Witness**

18       MGAM objects to Gamco's expert witness Susan Spielman under the standard qualifying

19 expert witnesses set forth in Federal Rules of Evidence 702 and 703 and *Daubert v. Merrell Dow*

20 *Pharm., Inc.*, 509 U.S. 579 (1993).  (Doc. No. 323).

21       "A trial court can only consider admissible evidence in ruling on a motion for summary

22 judgment."  *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002); Fed. R. Civ. P. 56(e)(1).

23 Expert evidence therefore must meet the standard of relevance and reliability articulated in

24 *Daubert:*

25       Faced with a proffer of expert scientific testimony . . . the trial judge must determine . . .
         whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the
26       trier of fact to understand or determine a fact in issue.  This entails a preliminary
         assessment of whether the reasoning or methodology underlying the testimony is
27       scientifically valid and of whether that reasoning or methodology properly can be applied
         to the facts in issue.

28
   509 U.S. at 592-93; *see also* Fed. R. Evid. 702 (permitting expert to testify only if: "(1) the

                                                    - 4 -                                         04cv1053

1    testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

2    principles and methods and (3) the witness has applied the principles and methods reliably to the

3    facts of the case."); Fed. R. Evid. 703 (requiring the facts or data upon which the expert relies to

4    be "of a type reasonably relied upon by experts in the particular field").  The Court has a

5    gatekeeping responsibility to determine whether such expert testimony complies with Rules 702

6    and 703.  *Daubert*, 509 U.S. at 592**;** *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137,

7    148-49 (1999).

8           Further, issues related to patent infringement and invalidity "are analyzed in great part

9    from the perspective of a person of ordinary skill in the art, and testimony explaining the technical

10   evidence from that perspective may be of great utility to the factfinder."  *Sundance, Inc. v.*

11   *DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1361-62 (Fed. Cir. 2008).  Accordingly, the Federal

12   Circuit has held that a trial court abuses its discretion if it allows testimony from an expert witness

13   who has "no skill in the pertinent art."  *Id.*  This, the Federal Circuit observed, "serves only to

14   cause mischief and confuse the factfinder."  *Id.*  at 1362.

15          It is undisputed that Ms. Spielman has substantial experience with distributed computer

16   networking systems.  However, Ms. Spielman admittedly has no expertise or experience in the

17   field of gaming or lottery systems.  (*See* Bjurstrom Decl. ISO Reply, Ex. X (Spielman Depo.) at

18   19:20-20:8; *see also id.* at 5:9-12.)  In fact, Ms. Spielman's deposition clearly evidences that Ms.

19   Spielman cannot define an instant lottery game and lacks a genuine understanding of gaming and

20   lottery systems.  (*See* Bjurstrom Decl. ISO Reply, Ex. X at 73:1-75:3.)  Further, MGAM contends

21   that distributed computing experience "is only tangentially related to the relevant field of gaming

22   and lottery systems" and that Ms. Spielman's lack of experience in gaming and lottery systems

23   renders Ms. Spielman from offering a reliable opinion in this case.  (Obj. at 5.)  The Court

24   disagrees.  While Ms. Spielman may lack the context in which these patents and technologies at

25   issue are designed and implemented, i.e. a gaming or lottery system, the main component of the

26   '035 patent and its technologies at issue is clearly the distributed computing system.  The '035

27   Patent uses well-known computer processes which are found not only in gaming systems but

28   distributed computer networking systems in general.  Further, while MGAM conclusively argues

1   that Ms. Spielman's lack of experience in gaming and lottery systems renders her opinions

2   unreliable as a whole, MGAM does not specifically point to any claims or interpretation of those

3   claims where experience in these systems is essential to offering a valid, reliable expert opinion

4   which will aid the factfinder.  To the contrary, as will become more apparent throughout this

5   Order, the claims are based almost entirely on the distributed computer system elements used to

6   implement the gaming and lottery systems at issue and not the gaming aspects of the lottery

7   system itself.  In other words, experience in gaming and lottery systems is not necessary to aid the

8   factfinder in making determinations of invalidity and infringement of the '035 Patent's distributed

9   computer networking system and its claims.[3]  Thus, the Court **OVERRULES** MGAM's objection.

10  **II.      MGAM's Expert Witness**

11          Gamco argues in its sur-replies that MGAM's expert witness Stacy Friedman's opinions

12  should be discredited due to his alleged improper reliance on extrinsic evidence and faulty

13  constructions of the '035 Patent.[4]  MGAM further argues that MGAM's counsel interfered with

14  discovery and improperly influenced Mr. Friedman's opinions on non-infringement.[5]

15  Accordingly, Gamco contends that his opinions should be given little or no weight and cannot

16  properly serve as the basis for finding an absence of genuine issues of fact.  The Court finds no

17  merit to these assertions and, regardless, at the motion for summary judgment stage, the Court

18  does not make credibility determinations or "weigh" the evidence.  *See Musick v. Burke*, 913 F.2d

19  1390, 1394 (9th Cir. 1990).  Moreover, any discovery disputes are properly brought up before the

20

21          [3]      MGAM further argues that Ms. Spielman's testimony is inconsistent, is based on
    inaccurate interpretations and citations of the authorities upon which she relies, and is based on faulty
22  assumptions, thus rendering her opinion as a whole unreliable.  To this, the Court finds that any such
    inconsistencies or inaccuracies do not disqualify Ms. Spielman's testimony outright, but rather are
23  more properly addressed as applied to the merits of those claims.  At this stage, however, the Court
    does not weigh evidence nor does it make credibility determinations.
24
25          [4]  Gamco cites to four sources allegedly improperly relied on: (1) Gamco's alleged
    interpretation of the '035 Patent; (2) the legal opinion of IGT's former outside patent counsel
26  regarding the infringement of the '035 Patent by Sierra Design Group's gaming system; (3) the
    incorrect construction ruling of the Nevada District Court; and (4) Mr. Friedman's broad interpretation
    of this Court's claim construction.  (Invalidity Sur-Reply at 2.)
27
28          [5]  Notably, the sur-reply to the invalidity motion for summary judgment contained arguments
    related to Mr. Friedman's opinions on  infringement in an effort to circumvent this Court's order
    limiting the sur-replies to both motions to 10 pages each.

1    magistrate judge, not this Court.  As such, the Court will not discredit or disqualify Mr.

2    Friedman's opinions on these grounds.

3    **III.    MGAM's request to reconsider claim construction of "game play record" and "game**

4    **play records"**

5             In its opening motion for summary judgment of non-infringement, MGAM brings to the

6    Court's attention for the first time a prior Nevada federal district court's construction of the terms

7    "game play record" and "game play records."  This opinion was not before the Court at this

8    litigation's claim construction hearing and MGAM now moves the Court to reconsider its

9    construction of these claim terms and adopt the Nevada court's construction under the doctrine of

10   collateral estoppel.  (*See* Infringement MSJ at 3-6, 7-10.)  For the reasons explained below, the

11   Court grants reconsideration of the construction of the terms "game play record" and "game play

12   records"; adopts the Nevada court's construction; and hereby construes these terms to mean:

13   "electronic game play record(s) which includes graphic data transmitted to the player terminal."

14            The Nevada litigation involved the Sierra Design Group ("SDG") and Oasis Technology,

15   Inc. ("Oasis").  SDG had acquired the Troy patent referenced above and developed a video lottery

16   system in Washington State.  (Lannert Decl. ISO MSJs, ¶ 2.)  In March 1999, Oasis (the then-

17   current owner of the '035 Patent) asserted that SDG's system was infringing the '035 Patent.[6]  On

18   November 12, 1999, SDG filed a declaratory relief and preliminary injunction action against Oasis

19   in the United States District Court for the District of Nevada to determine if the SDG system

20   infringed the '035 patent.  (*See id.*, Ex. I (Complaint).)  As a result, the district court conducted a

21   three-day claim construction hearing which included numerous witnesses and live testimony.  (*See*

22   *id.*, Ex. J (excerpts from hearing).)

23            On June 20, 2000, the district court issued its decision from the bench.  (*See id.*, Ex. L.)

24   The court construed the terms "game play record" and "game play records" as used in Claim 1 of

25   the '035 Patent to mean:

26   _____

27            [6]  In response, SDG's counsel opined that the SDG system did not infringe, literally or by
     equivalents, the '035 Patent.  (*See* Bjurstrom Decl. ISO MSJs, Ex. G.)  In addition, IGT, a provider of
     video lottery and game themes to SDG, obtained an opinion letter from its patent counsel as to
28   whether the SDG system infringed the '035 patent.  IGT's counsel also opined that it did not.  (*See*
     *id.*, Ex. H.)

[T]he bundle of information or signal transmitted from the master computer to the player or slave terminal at the time a player requests a play. The ['035] Patent provides for transmission from the master computer to the slave terminal of an indication whether the particular play constitutes a winning or losing play, and the amount won.

(*Id.*, Ex. L at 175.)

The court went on to review the specifications and the prosecution history. The court found that, from the specification, "it is clear under the ['035] patent that to the extent the game play record involves graphic data and game play information, that data is generated by the central computer, not by the slave terminal, and it is transmitted to the slave terminal by means of the master computer." (*Id.*, Ex. L at 177.) The court then analyzed the prosecution history of the '035 patent, including the Patent Examiner's comments regarding the Troy patent, and concluded that the amendments made "must be viewed as intended to distinguish the ['035] invention from Troy and other prior inventions." (*Id.*, Ex. L at 182.) Thus, the court found that the only way to distinguish the amended claims from Troy was to find that "the bundle of information transmitted by the master computer to the slave terminal must include graphics to be displayed in the slave terminal." (*Id.,* Ex. L at 183.) "Claim 1 of the ['035] patent, in order to be valid, must be read to include the requirements that the graphic information that will be displayed in the player terminal be generated by the master computer or higher in the network." (*Id.*, Ex. L at 185.)

After the district court's construction, the litigation was dismissed, with prejudice, in March 2001 pursuant to a settlement reached between SDG and Oasis. (*See id.*, Ex. M.) The court's opinion construing Claim 1 was not vacated.

While this opinion was admittedly in the possession of both parties at the time of the claim construction hearing before this Court, neither party brought it to the Court's attention.[7] Accordingly, without the benefit of this construction or the potential estoppel effect of this decision, the Court construed "game play record" to mean "electronic game play record." (Doc. No. 252 at 6.) If the Court had had this opinion before it, it would have undoubtedly considered

---

[7] MGAM admits that "just recently," it located the decision within the documents produced by Gamco during discovery "cleverly buried in a large pile of 'prior art' references" for devices having nothing to do with the patent at issue in this case. (*Id.*; *see also* Ex. W (irrelevant prior art).) The Court admonishes both parties for failing to bring this opinion to the Court's attention and finds that fault is properly attributed to both parties, though more so to Gamco considering its role in and awareness of the Nevada litigation.

this opinion and would have ultimately adopted its construction under the doctrine of collateral estoppel.  Because it would have done so then, it will do so now.

As a threshold matter, Collateral estoppel may apply to claim construction determinations. *See In re Freeman*, 30 F.3d 1459, 1465-69 (Fed. Cir. 1994); *see also TM Patents, LP v. IBM Corp.*, 72 F. Supp. 2d 370 (S.D.N.Y. 1999).  Under Ninth Circuit law, collateral estoppel applies if:  "(1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and 3) the party against whom collateral estoppel is asserted was a party or in privity with a party in the first proceeding."  *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000).  The first and third factors are clearly met in this action and are not disputed by the parties.

As for the second factor, Gamco argues that the Nevada district court's decision is not a "final judgment on the merits" sufficient to apply summary judgment.[8]  Under Ninth Circuit law, a court approved settlement is a final judgment on the merits for purposes of collateral estoppel.  *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006).  Gamco, however, contends that Federal Circuit law should control and that the Federal Circuit requires that the claim construction must have been "the reason for the loss on the issue of infringement" in the prior case in order to apply collateral estoppel  *See In re Freeman*, 30 F.3d at 1466; *see also A.B. Dick Co. v. Burroughs Corp*, 713 F.2d 700, 704 (Fed. Cir. 1983) ("[J]udicial statements regarding the scope of patent claims are entitled to collateral estoppel effect in a subsequent infringement suit only to the extent that determination of scope was essential to a final judgment on the question of validity and

---

[8]  Further, Gamco incorrectly contends that collateral estoppel is not applicable because MGAM did not have the opportunity to appeal the prior district court's construction order.  *See Kollmorgen Corp. v. Yaskawa Elec. Corp.*, 147 F. Supp. 2d 464 (W.D. Va. 2001); *see also Rambus Inc. v. Hynix Semiconductor Inc.*, 569 F. Supp. 2d 946, 968 (N.D. Cal. 2008) ("The inability to obtain appellate review bars the application of issue preclusion.")  In *Kollmorgen*, the court found:

As the Wisconsin Court never reached a decision as to the patent infringement claim, the order necessarily could not prove essential to a non-existent final judgment, and thus, collateral estoppel will not apply to the determination of patents . . .

*Id.* at 469-70.  While it is true that a claim construction is not immediately appealable, the Nevada opinion and construction was pursuant to a declaratory relief and preliminary injunction action and therefore was immediately appealable.  The parties, however, chose to settle the case rather than appeal the decision.  Thus, this argument is without merit.

04cv1053

1    infringement."); *Graco Children's Prods., Inc. v. Regalo Intern., LLC*, 77 F. Supp. 2d 660, 664

2    (E.D. Pa. 1999).  This contention is misguided.  Collateral estoppel is not a matter exclusively

3    within the Federal Circuit's jurisdiction.  *See Source Search Tech., LLC v. LendingTree, LLC*, 588

4    F.3d 1063, 1071 (Fed. Cir. 2009).  Thus, the Federal Circuit must construe the relevant circuit law

5    when determining collateral estoppel issues; in this case, Ninth Circuit law.  *See id.*; *see also*

6    *Bayer AG. v. Biovail Corp.*, 279 F.3d 1340, 1345 (Fed. Cir. 2002).

7           To be sure, the Federal Circuit has recognized that some circuits require for purposes of

8    collateral estoppel that the "previous determination [be] necessary to the decision," *see Source*

9    *Search Tech.*, 588 F.3d at 1074 (applying Third Circuit law), or that "the determination of the

10   issue in the prior litigation must have been a critical and necessary part of the judgment in that

11   action," *see Bayer AG.*, 279 F.3d at 1345 (applying Eleventh Circuit law).  However, such a

12   requirement is not an element in the Ninth Circuit.  *See, e.g., Af-Cap, Inc. v. Chevron Overseas*

13   *(Congo) Ltd.*, 475 F.3d 1080, 1086 (9th Cir. 2007); *Hydranautics*, 204 F.3d at 885.  Accordingly,

14   Gamco's contention that the Federal Circuit has held that the construction must be essential to the

15   final determinations under the applicable circuit law in those cases, this has no bearing on this

16   Court's collateral estoppel determination under Ninth Circuit precedent.

17          As such, applying Ninth Circuit law, the Court finds that the settlement in the Nevada

18   litigation is appropriately considered a final judgment on the merits for purposes of collateral

19   estoppel.  *See Reyn's*, 442 F.3d at 746; *see also Rein v. Providian Financial Corp.*, 270 F.3d 895,

20   903 (9th Cir. 2001); *In re Dominelli*, 820 F.2d 313, 316-17 (9th Cir. 1987).  In fact, the Central

21   District of California has explicitly recognized the position that

22          A party who cuts off his right to review by settling a disputed matter cannot complaint that
             the question was never reviewed on appeal.  The *Markman* rulings were not vacated as part
23           of the settlement.  They therefore remain preclusive.

24   *See Curtiss-Wright*, 563 F. Supp. 2d at 1121-22 (citing *TM Patents,* 72 F. Supp. 2d at 378).  As

25   such, the court found that the claim was "thoroughly litigated" in the prior litigation and therefore

26   precluded the parties from relitigating the construction of that claim.  *See id.* at 1121-22.  The

27   court further noted that the decision in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370

28   (1996), emphasized the promotion of uniformity in construing a patent claim and that "it is

1  inconceivable that a fully-litigated determination after a first *Markman* [claim construction]

2  hearing would not be preclusive in subsequent actions involving the same disputed claims under

3  the same patent." *Id.* (quoting *TM Patents,* 72 F. Supp. 2d at 377).[9]

4       As such, the Court exercises its discretion and grants reconsideration of its claim

5  construction in light of the Nevada court's opinion now before the Court. *See* Fed. R. Civ. P.

6  60(b).  Further, having found that all three requirements of Ninth Circuit's doctrine of collateral

7  estoppel apply in this case, the Court adopts the Nevada district court's construction of "game play

8  record" and "game play records" to include graphic data transmitted to the player terminal.[10]

9  **IV.    Infringement Analysis**

10      The '035 Patent discloses four independent claims (Claims 1, 15, 16, and 18) and 14

11  dependant claims.  Gamco asserts that the MGAM System for the NYSL infringes multiple claims

12  of the '035 Patent.  MGAM moves for summary judgment of non-infringement of each

13  independent and dependant claim.  Thus, the Court must determine whether independent Claims 1,

14  15, 16, and 18 are not infringed by the MGAM System as a matter of law sufficient to grant

15  summary judgment of non-infringement.[11]

16  *//*

---

17

18      [9]  Gamco cites to the Western District of Virginia case of *Kollmorgen*, which noted that while *Markman* emphasized consistency and uniformity, this "presupposes that the court's construction of

19  the patent is correct . . . [and] does not stand for the blanketed adoption of patent constructions without first undergoing the Federal Circuit's rigorous review."  *Kollmorgen*, 147 F. Supp. 2d 468-69.

20  *Kollmorgen*, however, is a district court decision from Virginia and therefore does not trump the Central District of California's opinion to the contrary.

21      [10]  In doing so, the Court takes heed of the fact that this construction is adopted after all

22  discovery has been completed in the matter and that Gamco asserts prejudice because it was not able to conduct discovery based on this construction.  However, Gamco did not argue prejudice in its

23  opposition and has not substantiated what prejudice will actually occur.  As explained below, Gamco does not dispute in his papers or at oral argument that the MGAM System's game play records do not

24  include graphic data transmitted to the player terminals.  As such, there appears to be no amount of discovery which will aid Gamco in attempting to argue that the MGAM System did in fact include

25  such graphic data sufficient to infringe the '035 Patent under this construction.  Thus, while recognizing the potential impact of such a late construction, no prejudice has been established and,

26  regardless, any resulting prejudice is largely due to Gamco's failure to bring the Nevada court's decision to this Court's attention at the time of the claim construction hearing.

27      [11]  If the Court finds that Claim 1 is not infringed as a matter of law, then Claims 2-14, which

28  depend from and include all limitations of Claim 1, are not infringed as well.  Further, if the Court finds that Claim 16 is not infringed, so is the dependent Claim 17. *See Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n. 9 (Fed. Cir. 1989).

04cv1053

1   //

2        **A.    Legal Standard**

3        "To prove literal infringement, the patentee must show that the accused device contains

4   every limitation in the asserted claims." *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285

5   F.3d 1353, 1358 (Fed. Cir. 2002) (quoting *Mas-Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206,

6   1211 (Fed. Cir. 1998)).  "If even one limitation is missing or not met as claimed, there is no literal

7   infringement." *Mas-Hamilton Group*, 156 F.3d at 1211.

8        Even where the accused device does not literally infringe, the patentee may prove

9   infringement under the doctrine of equivalents. *See Kemco Sales, Inc. v. Control Papers Co.*, 208

10  F.3d 1352, 1364 (Fed. Cir. 2000).  The doctrine of equivalents prevents a defendant from avoiding

11  infringement by making unimportant or insubstantial changes to the claimed invention. *See Festo*

12  *Corp. v. Shoketsu Kinzoku Kabushiki Co.*, 535 U.S. 722, 730-32 (2002); *Lear Siegler, Inc. v. Sealy*

13  *Mattress Co. of Michigan, Inc.*, 873 F.2d 1422, 1425 (Fed. Cir. 1989).  Thus, under the doctrine of

14  equivalents, infringement occurs when the allegedly infringing device and claimed limitation

15  perform "substantially the same function in substantially the same way to obtain substantially the

16  same result." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 38 (1997); *Lockheed*

17  *Martin,* 324 F.3d at 1317.  Courts apply the function-way-result analysis to each limitation of a

18  claim, and "there can be no infringement if even one limitation of a claim or its equivalent is not

19  present in the accused device." *Lockheed Martin*, 324 F.3d at 1321; *see also Pennwalt Corp. v.*

20  *Durand-Wayland, Inc.*, 833 F.3d 931, 935-36 (Fed. Cir. 1987).  The patentee must provide

21  evidence and argument for each element of the function-way-result analysis and on a "limitation-

22  by-limitation basis." *See Lear Siegler*, 873 F.2d at 1425; *Hewlett-Packard Co. v. Mustek Sys.*, 340

23  F.3d 1314, 1323 (Fed. Cir. 2003); *see also Malta v. Schulmerich Cariollons, Inc.*, 952 F.2d 132,

24  1327 (Fed. Cir. 1991).

25       In proving infringement under the doctrine of equivalents, a patentee may be limited by the

26  doctrine of prosecution history estoppel.  "Prosecution history estoppel requires that a claim of a

27  patent be interpreted in light of the proceedings in the PTO during the application process." *Festo*

28  *Corp.*, 535 U.S. at 733.  The Federal Circuit has "recognized that prosecution history estoppel can

1  occur . . . in one of two ways, either (1) by making a narrowing amendment to the claim

2  ("amendment-based estoppel") or (2) by surrendering claim scope through argument to the patent

3  examiner ("argument-based estoppel")." *Conoco, Inc. v. Energy & Envtl. Int'l., L.C.*, 460 F.3d

4  1349, 1363 (Fed. Cir. 2006) (citation omitted); *see also PODS, Inc. v. Porta Stor, Inc*, 484 F.3d

5  1359, 1367 (Fed. Cir. 2007). If a claim is narrowed for any reason related to patentability, "the

6  inventor is deemed to concede that the patent does not extend as far as the original claim." *Id.*; *see*

7  *also Glaxo Wellcome, Inc. v. Impax Labs., Inc.*, 356 F.3d 1348, 1352 (Fed. Cir. 2004) (stating that

8  if a claim is so narrowed, it is presumed "that the patentee surrendered the territory between the

9  original claims and the amended claims"). The patentee bears the burden of establishing that the

10  amendment does not surrender the territory between the original claim and amended claim. *See*

11  *Festo Corp.*, 535 U.S. at 740.

12      Finally, "there can be no infringement under the doctrine of equivalents if the asserted

13  scope of equivalency would encompass prior art." *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d

14  1314, 1332 (Fed. Cir. 2001); *see also Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904

15  F.3d 677, 684 (Fed. Cir. 1990).

16      **B.      The MGAM System for the NYSL[12]**

17      The MGAM System is a three-tier system with the first tier made up of a Primary Data

18  Center and Backup Data Center, the second tier made up of Site Controllers, and the third tier

19  made up of player terminals referred to as video lottery terminals ("VLTs").[13] (Enzminger Decl.

20  ISO MSJs, ¶ 16.) The Site Controller(s) are the "master processing unit" as set forth in the

21  Claims.[14] The Site Controller is made up of several computers, the primary of which is the Site

22  Controller Database, which communicates with the Primary Data Center. (*Id.*, ¶ 19.) Each Site

23  ―――――――――――――

24  [12]    The following description is from Joe Enzminger and generally undisputed unless otherwise noted. Mr. Enzminger is a technical consultant to MGAM who "was the lead system architect charged with designing, developing, and implementing" the MGAM system for the NYSL.

25  (Enzminger Decl. ISO MSJs, ¶ 9.)

26  [13] The terms VLTs, player terminals, and slave terminals are used interchangeably throughout this Order.

27

28  [14]    There is some argument as to whether the Site Controllers, collectively, make up the "master processing unit," as asserted in Gamco's Final Infringement Contentions. (*See* Bjurstrom Decl. ISO MSJs, Ex. R.) This argument is not reasserted in the papers and is not dispositive.

1    Controller also includes several VLT Services, which are the computers that distribute the

2    electronic ticket data to the VLTs.  (*Id.*)  Each VLT is connected to one VLT Service.  (*Id.*)  The

3    VLTs are manufactured by third party venders such as IGT and are "generally designed to look

4    like modern video slot machines."  (*Id.*, ¶ 20.)  These video games are played at seven different

5    "racinos" in New York, and one Site Controller is located at each racino.  (*Id.*, ¶ 28.)

6          Once all the tickets for a game set (a complete lottery ticket pool) have been randomized,

7    the Primary Data Center divides the tickets into subsets prior to encrypting them and storing them

8    in a hard drive at the Primary Data Center.  (*Id.*, ¶ 24.)  Ticket subsets are then held in reserve at

9    the Primary Data Center as well as at individual Site Controllers for distribution to the VLT

10   Services.  (*Id.*, ¶ 25, 26.)  "When the number of subsets held in reserve drops below the

11   predetermined number, the Site Controller requests and receives additional game subsets from the

12   Primary Data Center."  (*Id.*, ¶ 26.)  The VLT Service also copies and reserves subsets from the Site

13   Controller, which in turn decompresses, unencrypts, and loads the subset into RAM memory.  (*Id.*,

14   ¶ 27.)  Therefore, when a player initiates game play on his or her VLT, that VLT requests a ticket

15   from the VLT Service's subset to which it is connected (it is only connected to one).  (*Id.*, ¶ 29.)

16   "The ticket information that is sent to the VLT includes the prize value, the prize index and the

17   extended information."  (*Id.*)

18        **C.    MGAM's Master Processing Unit Does Not Distribute Game Plays from a**

19              **Determinable Complete Set of Game Plays (All Claims)**

20          All claims of the '035 Patent require the master processing unit to distribute "game plays"

21   to "a plurality of slave terminals" from the "finite pool" of game plays.  The Court has construed

22   "finite pool" to mean "a determinable complete set."  (Doc. No. 252 at 6 (hereinafter "Order").)

23   MGAM contends that this limitation is not infringed, literally or by equivalents, by the MGAM

24   System because the MGAM System does not distribute its game plays from "a finite pool" as

25   construed by this Court; rather, the MGAM System distributes game plays from a subset of game

26   plays.  The Court agrees.

27          The MGAM System randomizes and immediately divides the complete set of game plays

28   into subsets prior to storing those subsets at the Primary Data Center.  (Enzminger Decl. ISO MSJs

at ¶ 24.)  A number of these subsets are then distributed to the Site Controllers, which then store

the subsets and distribute game plays to the player terminals from the subset.  (*Id.*, ¶ 25, 26.)  The

parties do not dispute the fact that the set of game plays is broken up into random subsets and

stored on the Site Controller.  Further, it is clear that the master processing unit (the Site

Controller) does not literally distribute game plays *from* the determinate complete set as disclosed

in the '035 Patent; it distributes the game plays *from* the subset.  As such, the Court finds no

genuine issue as to whether the MGAM System literally infringes this claim limitation.

Gamco contends, however, that even though the game plays are broken up into subsets, the

subsets in the MGAM System are derived from the same determinable complete set and thus are

substantially the same under the doctrine of equivalents.  In support of its infringement claim,

Gamco relies entirely on the declaration of its expert witness Ms. Spielman to create a genuine

issue of material fact whether the limitation is infringed under the doctrine of equivalents.  Ms.

Spielman opines:

> [W]hen the determinable complete set of game plays is created, whether or not these game plays are further broken down into subsets and distributed and/or stored on various other servers has no effect on the properties of the determinable complete set as a whole.  Once the determinable complete set of game plays is created, whether or not that set is 'chopped up' or spread out and distributed across various other machines or systems is not limited by the claims of the '035 Patent.  All the subset are created from the one determinable complete set, with a predetermined number of wining and losing tickets, regardless of where the subsets reside or where they are distributed.

(Spielman Decl. ISO Infringement Opp., ¶ 12 (internal footnote omitted).)  Thus, Ms. Spielman

concludes that the MGAM System performs "substantially the same function, in substantially the

same way, to achieve substantially the same result" as this claim limitation in the '035 Patent.  (*Id.*

¶ 15.)

The Court finds this opinion conclusory, unhelpful, and insufficient to defeat summary

judgment.  Ms. Spielman fails to connect how the conclusion that the properties of the complete

set remain unchanged when divided and distributed into subsets meets each element of the

function-way-result analysis; i.e. how the Site Controller distributing game plays from subsets

achieves substantially the same function, the same means, and the same result as distribution from

a determinable complete set.  *See Lear Siegler*, 873 F.2d at 1425.  "[I]t is well settled that an

expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a

genuine issue of material fact." *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed. Cir. 2000) (citing *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317 (Fed. Cir. 1999); *see also Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358 (Fed. Cir. 2007) (recognizing that an expert's conclusory statements that claims are "substantially equivalent" without specificity or particularized evidence or testimony is insufficient to defeat summary judgment based on the doctrine of equivalents).  To the contrary, multiple players drawing from a subset which has a random number of wins/losses and prize values and where each subset contains different portions of that complete set is fundamentally distinguishable from multiple players drawing from the complete set of predetermined losses, wins and prize values.  (*See* Friedman Decl. ISO Infringement MSJ, ¶¶ 14, 15.)  Further, Gamco submits insufficient evidence as to how distribution *from* a subset is the equivalent of distributing *from* the complete set simply because the properties remain unchanged.  (*See* Friedman Decl. ISO Infringement Reply, ¶¶ 4-8.)  As such, the Court finds that Gamco has not submitted evidence sufficient to create a genuine issue of material fact as to whether this claim limitation was infringed either literally or by equivalents.[15]

> ### D.    MGAM System Does Not Store in Memory at the Site Controller a Complete Set of Game Plays (All Claims)

Each of the claims of the '035 Patent requires a "memory device" "coupled" to the "master processing unit," the memory device "operative to store" at least "one finite pool" of "game plays."  (*See* '035 Patent Claims 1, 15, 16, and 18.)  The Court has construed "memory device" to mean "computer memory for storing and retrieving data, such as random access memory [RAM] and disk drive memory."  (Order at 6.)  The Court has construed "coupled" as "directly or indirectly connected."  (*Id.*)

MGAM first contends that the memory device connected to the Site Controllers, the master processing units, do not store a complete set of game plays, but only subsets sent to them by the

---

[15] As such, the Court declines to address in detail MGAM's argument that Gamco is precluded from arguing equivalents based on the doctrine of prosecution history estoppel.  However, the Court notes that the '035 Patent was amended to include the distribution of tickets from a "finite pool," admittedly to address patentability concerns by the USPTO, including the prior art reference Troy.  (*See* Opp. to Invalidity MSJ at 3; *see also* Preliminary Amendment at 230.)  It is Gamco's burden to establish that this amendment was not related to patentability.  *See Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1356 (Fed. Cir. 2003); *see also Festo Corp.*, 535 U.S. at 740-41.

1   Primary Data Center.  (Infringement MSJ at 17 (citing Enzminger Decl. ISO MSJs, ¶¶ 24-27, 30-

2   31).)  Furthermore, MGAM contends that a specific Site Controller cannot access the memory

3   devices at other Site Controllers and the Primary Data Center, and therefore those memories are

4   not "directly or indirectly connected" to the requesting Site Controller.  (*Id.*, ¶¶ 30, 35; *see also*

5   Friedman Decl. ISO Infringment MSJ, ¶ 29.)

6          In response, Gamco contends that the limitation that the complete game set be stored in

7   memory is met because the complete set is stored in RAM while the game set is being built and

8   randomized.  (*See* Passerelli Decl. ISO Opps., Ex. G (Enzminger Depo.) at 91, 38-39.)  Gamco

9   contends that, even if this storage in RAM is temporary, it meets the requirement of the claim that

10  the "finite pool" be stored in a "memory device."   The Court agrees.  The Court specifically

11  construed "memory device" to include, for example, RAM.  Thus, pursuant to the claim and its

12  construction, the "memory device" may be RAM, and the RAM in the MGAM System does, at

13  one point, store the determinable complete set, prior to being divided into subsets and prior to

14  sending those subsets to the Site Controllers.  As such, this element is met by the MGAM System.

15         However, the limitation that the "memory device" be "coupled" with the master processing

16  unit remains at issue.  While conceding the memory devices located at the Site Controller stores

17  only subsets of game plays, Gamco contends that the memory devices located at the Primary Data

18  Center are nevertheless directly or indirectly connected to the Site Controller.  To that, MGAM

19  maintains that the memory devices at the Primary Data Center are not connected to the Site

20  Controllers because they are not "directly accessed" or "visible" to the Site Controller.  Instead,

21  Gamco contends that the memory device is "indirectly connected" to the Site Controller even

22  though it is located on another machine in the system and that MGAM is attempting to read

23  limitations into the claim and expand the Court's construction.  To this, MGAM contends that

24  Gamco's definition of "indirectly connects" is too expansive and does not consider that the

25  "coupled with" language, versus simply being connected to any computer in the network, must

26  mean something.  The Court finds both interpretations plausible in light of the claims, this Court's

27  construction, and expert opinions and therefore finds that Gamco has sufficiently defeated

28  summary judgment of non-infringement of this claim limitation.   Thus, the Court denies

1    Defendants' motion for summary judgment insofar as it pertains to this limitation.

2        **E.    Information on Whether The Play is Winning or Losing and The Amount Won**

3        Each claim of the '035 Patent also requires that "each game play record contain[] an

4    indication of whether the particular play constitutes a winning or losing play and the amount won."

5    (Patent Claims 1, 15, 16, and 18.)  The Court has construed "contains an indication of" to mean

6    "including information specifying."  (Order at 6.)  This claim limitation involves the Nevada

7    litigation discussed above.  MGAM contends that, pursuant to the Nevada district court's

8    construction, the game play record must include the dollar value won as well as "graphic data"

9    indicating whether the play was a winning or losing play.  As discussed above, the Nevada court

10   found that, in order to distinguish the '035 patent from Troy, additional information other than a

11   numerical number must be transmitted between the Site Controllers and the VLTs.  (*See* Bjurstrom

12   Decl. ISO MSJs, Ex. L at 183-84.)  This additional information, according to the Nevada court, is

13   graphic data to be displayed on the player terminals, the VLTs.  (*Id.*; *see also* Friedman Decl. ISO

14   Infringement MSJ, ¶ 34.)  Because the Court applies collateral estoppel and adopts the Nevada

15   court's construction, the Court agrees that each game play record must include graphic data

16   transmitted to the player terminal pursuant to this claim limitation.[16]

17       It is undisputed that the MGAM System's game play records do not transmit symbols or

18   other graphic data to the VLTs and that the manufacturers of the VLTs independently determine

19   the display of the outcome of the game.  (Enzminger Decl. ¶ 37.)  As such, this claim limitation as

20   construed by the Nevada court and re-construed by this Court is not met as a matter of law and the

21   Court finds that the MGAM System does not infringe this limitation either literally or by

22   equivalents.  (*See* Enzminger Decl. ISO MSJs, ¶¶ 36-38.)

23       **F.    Multiple Game Plays in Response to a Single Game Play Request**

24       MGAM further contends that Claims 1, 16, and 18 and those claims that depend on these

25   independent claims, are not infringed by the MGAM System.  The '035 Patent claim discloses, in

26   ──────────────────

27       [16]  Interestingly, IGT sought an opinion of counsel in connection to the SDG litigation who
     agreed with the Nevada district court and its finding that the game play record of the '035 Patent
28   discloses that graphics or symbols must be displayed on the player terminal. (*See* Bjurstrom Decl. ISO
     MSJs, Ex. H at 133-135.)

pertinent part: "each slave terminal . . . to receive game play records in response to a game play request received from the player." (*See* '035 Patent Claims 1, 16, and 18.) The Court construed "in response to a game play request received from a player" to mean "each time a player makes a single request for a game play." (Order at 6.) As such, the '035 Patent requires two or more game play records in response to a single game play request. MGAM contends, however, that in its system, when the VLT makes a single game play request, it receives only one game play record in response; specifically, either a RequestPlayResponse or RequestPlayVoucherResponse, but no other message or ticket. (*See* Enzminger Decl. ISO MSJs, ¶¶ 31-32.)

In its opposition, Gamco contends that MGAM incorrectly construes the claim to require multiple "game plays" in response to a request from a VLT when in fact the claim requires multiple "game play records" in response to a request from a player. Gamco explains:

> In common database terminology, a "record" can be referred to as a row within a single database table. Thus a record used within the '035 Patent or the MGAM Central System would be recognized, by anyone skilled in the art, as a single field or piece of information, or a group of related fields of information that are treated as a unit. As a result, MGAM's transmission of multiple pieces of information in response to a single request made by a player satisfies the language of the patent claims.

(Opp. to Infringement MSJ at 18 (citing Spielman Decl. ISO Infringement Opp., ¶ 30) (internal citations omitted).) The Court disagrees and instead finds that "game plays" and "game play records" are synonymous.[17] To adopt Ms. Spielman's interpretation of "record" would be to impermissibly drag extrinsic evidence and redefine "record" separate and apart from this Court's construction of that claim element. The Court will not do so. Instead, looking at the claims in the patent, it is apparent that these terms are used interchangeably. For example, claim element 1(b) reads:

> [A] memory device coupled to the master processing unit, the memory device operative to store at least *one finite pool of game plays*, each finite pool containing a predefined number of winning and [losing] *play records* wherein, *each game play record* contains an indication of whether *the particular play* constitutes a winning or losing *play* and the amount won.

---

[17] The Court did not construe, nor was it asked to construe, "game play" or "record" but only "game play record."

04cv1053

('035 Patent, Claim 1 (emphases added).)[18]

Gamco further contends that "multiple communication 'requests' may be triggered within the system by a single game play request made by a player." (*Id.*)  A single request may gather multiple records if the information requested is found on one or more components, servers or databases in the system.  (*See* Spielman Decl. ISO Infringement Opp., ¶ 30.)  Gamco contends that "even in the rare case that the database schema was structured in such a way as to have all related information in a single database table and row, it would be unusual to have a single record of information that would contain all of the information required to satisfy the complex logic necessary in determining game plays." (*Id.*)  Gamco then presents an example where it contends the "MGAM system sends a number of different game play records in response to particular winning plays." (*See* Opp. to Infringement MSJ at 19.)  Specifically, Gamco contends that, in response to a single request, the MGAM System sets both a response indicating prize index, prize value and progressive prize value parameters, as well as a separate "progressive_winner" command to the video lottery terminal. (*See* Passarelli Decl. ISO Infringement Opp., Ex. M at 309-13, 323-25; *see also* Spielman Decl., ¶ 29, 30.)

Again, the Court finds that this argument imports limitations into the Claim that are not there and were not construed by this Court.  The Court originally construed "game play record" to mean "electronic game play record" and did not further construe those various elements.  The Court's reconsideration and adoption of a new construction does not change this aspect of the original construction.  Furthermore, Gamco's example of when one game play request *may* result in multiple records being gathered does not change this result.  The '035 Patent, as construed by this Court, requires game plays records to be sent in response "*each time* a player makes a single request for a game play." (*See* Order. at 6.)  Even adopting Ms. Spielman's definition and application of "records," there is no evidence before this Court that both a RequestPlayReponse or RequestPlayVoucherReponse *and* a progressive_winner (or any other purported record) are sent

---

[18]   Furthermore, to define "game play records" to mean multiple records of information constituting a response to a player's single request does not jibe with the patent's requirement that each "game play record" include an "indication of a winning or losing play and the amount won."  As MGAM puts it: "Why would a player receive two different amounts won for a single game outcome? They wouldn't."

04cv1053

1   *each time* a player requests a game play.  As such, the Court finds that Gamco has not sufficiently

2   met its burden to defeat summary judgment of non-infringement of this claim limitation.

3        **G.      Input and Output Devices**

4        Each independent claim also requires a "plurality of player-controlled selection devices"

5   and a "plurality of output devices" with each device "coupled to a slave terminal."[19]  (*See* '035

6   Patent, Claims 1, 15, 16, 18.)  MGAM asserts that there is insufficient evidence in the record

7   establishing that the MGAM system's VLTs contain two or more selection devices and two or

8   more output devices.  (*See* Reply ISO Infringement MSJ at 10.)[20]  MGAM contends that Gamco's

9   most knowledgeable witness Mr. Michaelson, the staff engineer at IGT, has never seen the VLTs

10  placed in the New York racinos and had never played the New York video lottery.  (*See* Bjurstrom

11  Decl., Ex. Y at 38:6-15.)  Further, Ms. Spielman also has no direct knowledge of the VLTs' input

12  and output devices employed in the NYSL.  (*See Id.*, Ex. X at 182-186.)  Thus, MGAM contends

13  that there is simply no evidence that the VLTs of the MGAM System meet the input and output

14  elements of Claims 1, 15, 16, and 18 sufficient to defeat summary judgment of non-infringement

15  of this limitation.  The Court agrees.[21]

16       **1.      Input Devices**

17       While Gamco offers evidence of various input devices that can, and in the case of

18  touchscreens "should," be present in the MGAM System's VLTs, there is simply no evidence that

19  the actual VLTs used by the MGAM System for the NYSL contain a plurality of these input and

20  output devices as required by the '035 Patent.  (*See* Sur-reply to Infringement MSJ at 3-8.)  Gamco

21  bears the burden of establishing a genuine issue of material fact that the VLTs infringe upon the

22  '035 Patent because each and every limitation is met.  However, without a single document or

23

24       [19] Claim 15 does not disclose "a plurality" of selection and output devices, but rather discloses
"player-controlled selection means" and "output means" in the plural form.

25

26       [20] MGAM raised this argument for the first time in its reply brief, but the Court granted
Gamco leave to file a sur-reply to address this newly-raised issue.  (*See* Doc. No. 333.)

27       [21] MGAM makes much of the fact that the evidence submitted by Gamco establishes, at best,
evidence relating to the IGT VLTs, but no evidence as to the other manufacturers who provide VLTs

28  for the MGAM System.  This is irrelevant for purposes of this motion because if Gamco establishes
a genuine dispute as to whether even one VLT infringes this claim limitation, summary judgment is
defeated.

1   testimony establishing what input and output devices the VLTs used in the MGAM System, the

2   Court simply cannot find that any dispute is genuine.

3          Further, to the extent Gamco relies on the testimony of Mr. Michaelson as to what input

4   devices "should" be present on the VLTs, this evidence only establishes that *one* input device—a

5   touchscreen—should be present, not that a *plurality* of devices should be present much less that

6   they are present.  (*See* Catterbuck Decl. ISO Sur-Reply, Ex. B ("Michaelson Depo.") at 41:9-12.)

7   In fact, Mr. Michaelson explicitly testified that he did not know whether the IGT VLTs in the

8   NYSL do contain the various devices that can be included on the VLTs; in fact, he has never

9   played the NYSL, visited the sites, nor seen the VLTs specifically placed in New York.  (*See*

10  Michaelson Depo. at 33:6-15.)  Gamco also relies on the document provided by IGT entitled "New

11  York Gaming Agent Training Guide" which provides an illustration and explanation of parts of the

12  VLTs provided by IGT.  (*See* Clatterbuck Decl. ISO Sur-Reply, Ex. A ("Training Guide").)

13  However, Mr. Michaelson testified that he had never seen this document prior to litigation, that he

14  did not know what the document was used for, and that he did not know if the diagram accurately

15  reflected the VLTs provided for the NYSL and that IGT has "different models of top boxes and so

16  forth and we have different themes."  (Michaelson Depo. at 26:11-27:23.)  In other words, there is

17  no evidence in the record connecting the VLT diagramed in the document to the VLTs actually

18  provided (or even which should be provided) to the NYSL.  With only this evidence before the

19  Court and mere conjecture as to what the MGAM System actually or even likely contains, the

20  Court cannot draw any reasonable inferences sufficient to defeat summary judgment.  In other

21  words, the Court cannot find that a reasonable jury could return a verdict for the nonmoving party

22  based on the evidence before the Court.  *See Anderson*, 477 U.S. at 248.  Thus, the Court grants

23  MGAM's motion for summary judgment on non-infringement insofar as it applies to this claim

24  limitations.

25          **2.      Output Devices**

26          For the same reasons, the Court finds no evidence sufficient to create a genuine issue of

27  material fact, even after drawing all reasonable inferences in favor of Gamco, as to the whether the

28  MGAM System infringes the required output device limitation disclosed in the '035 Patent.

Again, MGAM did not admit that a plurality of output devices are found in the VLTs used by the

1  MGAM System, nor does Mr. Michealson's testimony or the training guide document produced by

2  IGT establish evidence of a plurality of output devices used in the NYSL sufficient to defeat

3  summary judgment.  Moreover, the '035 Patent discloses output devices which include

4  information specifying whether the play was a winning or losing play and the amount won, as

5  discussed above.  (*See* '035 Patent Claims 1, 15, 16 and 18.)  There is no evidence that any of the

6  output devices which the MGAM System may or can contain includes this information (much less

7  graphic symbols).  (*See* Michaelson Depo. at 46:3-20 (testifying to only a numeral indication);

8  30:7-10 (testifying generally about various musical cues depending on outcome and game theme);

9  *see also* Training Guide at 12 (describing ticket which prints only win amount); *id.* at 9

10  (describing, without specificity, "as an output, incadescent lights").  As such, the Court grants

11  MGAM's motion for summary judgment of non-infringement of this claim limitation.

### H.    Claim 15

13        Claim 15 includes all but one of the limitations discussed above.[22]  Thus, because the Court

14  finds no genuine issue of material fact as to whether the MGAM system meets these limitations,

15  Claim 15 is not infringed as a matter of law.  The Court therefore **GRANTS** MGAM's motion for

16  summary judgment of non-infringement of Claim 15.  As such, the Court declines to address

17  whether the MGAM system does not "employ the same or equivalent algorithmic structures

18  identified for elements 15(a) and (d) for requesting and receiving an electronic ticket."  (*See*

19  Friedman Decl. ISO Infringement MSJ, §§ 39, 41.)

## V.    Invalid as Anticipated by Troy and/or Koza

21        MGAM also moves for summary judgment of invalidity of the '035 Patent based on

22  theories of anticipation and/or obviousness.  For the reasons below, the Court **DENIES** MGAM's

23  motion for summary judgment of invalidity under both theories.

### A.    Legal Standard

25        35 U.S.C. § 102 states in pertinent part that "a person shall be entitled to a patent" unless

26  the invention has been anticipated because:

27        (a)    the invention was known or used by others in this country, or patented or described

---

[22]  Claim 15 does not require multiple game play records to be sent in response to a single game play request.

in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(e)    the invention was described in . . . (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent . . .

35 U.S.C. § 102(a) and (e)(2).[23]  "It is well settled that a claim is anticipated if each and every limitation [of the claim] is found either expressly or inherently in a single prior art reference." *Celeritas Techs., Ltd. v. Rockwell Intern. Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998), *cert. denied*, 522 U.S. 1106 (1999); *see also Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1149 (Fed. Cir. 2005).

The prior art references MGAM contends invalidate the '035 Patent as anticipated are Troy and Koza.

## B.    Effect of Nevada Court's Construction

MGAM concedes that, if the Court adopts the Nevada court opinion, the '035 Patent is not invalid as anticipated under either Troy or Koza.  There is no dispute that the limitation requiring game play records to include graphics or symbolic data transmitted to the player terminals is not met by these prior art references.  As explained above, the Court adopts this construction and thus denies Defendants' motion for summary judgment of invalidity on the theory of anticipation on this basis alone.[24]

However, even if the Court were to deny reconsideration and decline to adopt the Nevada court's construction, the Court would nevertheless deny MGAM's motion for summary judgment of invalidity.  For the reasons explained below, the Court finds a genuine issue of material fact as to whether all claim limitations in the '035 Patent are met by the single prior art reference of Troy or Koza pursuant to section 102 sufficient to defeat summary judgment of invalidity.

## C.    Troy

### 1.    Three-Tiered Distributed Gaming System

The system disclosed in the '035 Patent is a three-tiered gaming system comprised of a central game processor, a plurality of multiple processing units coupled to the central game

---

[23]  There are six subsections, but only sections (a) and (e)(2) are applicable to the present motion.  (*See* Invalidity MSJ at 4; Invalidity Opp. at 6.)

[24]  However, this finding does not preclude the Court from rendering the '035 Patent invalid based on the theory of obviousness; thus, the Court will discuss this below.

04cv1053

1   processor, and a plurality of player terminals, each player terminal receiving game play records

2   from the master processing unit in response to a game play request from a player.  (*See generally*

3   '035 Patent.)  Gamco contends that Troy does not include a third-tier equivalent of the master

4   processing unit, but instead is a two-tiered distributed lottery system comprised of a central

5   processor and a plurality of "player means remote from the central processor but communicating

6   therewith."  (*See* Spielman Decl. ISO Invalidity Opp., ¶ 9; *see also* Passarelli Decl. ISO Opps., Ex.

7   R. (hereinafter "Troy Patent").)  The Court finds that Defendant has sufficiently established a

8   genuine issue of material fact as to this limitation.

9           MGAM contends that Troy's "multiplexers/preprocessors" constitute the middle-tier

10   equivalent to the '035 Patent's master processing unit.  Specifically, MGAM contends that in Troy

11   the central processor creates the game set, which in turn distributes the game play to the

12   multiplexer which then distributes that game play to the attached player terminal.  (Friedman Decl.

13   ISO Invalidity, ¶ 6.)  MGAM contends that the central processor stores the complete set of game

14   plays, but the multiplexer stores a subset of the game plays.  (*Id.* ¶ 7.)

15           However, Ms. Spielman testifies that "[i]t is technically incorrect to include or reference

16   the multiplex/preprocessor as a separate tier in a distributed system" because it provides merely a

17   "data exchange and transformational function" which is not considered a tier level in a distributed

18   application.  (Spielman Decl. ISO Invalidity Opp., ¶¶ 10, 11.)  In support of this, Ms. Spielman

19   cites to Troy, which teaches: "The multiplexer/preprocessor 142 function would be to funnel data

20   received from the player consoles 100 at a slow rate and retransmit it at a high rate to the central

21   processor 144."  (Troy Patent at Col. 6:7-16.)  Furthermore, Troy states that a win message "be

22   sent to the player console 100 via the multiplexer," and Gamco contends the word "via" indicates

23   "by way of" or passing through.  (*See id.* at Col. 15:67-68; Spielman Decl. ISO Invalidity Opp., ¶

24   11.)  Accordingly, Gamco contends that the multiplexers "are not a separate tier of the system

25   responsible for receiving, storing and transmitting game plays" and therefore are not the equivalent

26   to the master processing units disclosed in the '035 Patent.  (Opp. to Invalidity MSJ at 10.)

27           MGAM contends, however, that the Troy patent's multiplexer/preprocessor does receive,

28   store and transmit game plays.  Claim 22 of the Troy patent claims the multiplexer and its function

     as follows:

1

2    A system in accordance with claims 15, 16, or 17 which includes a multiplexing processing means connected to said playing means and said central processor, with said multiplexing processing means capable of receiving data from said playing means and transmitting it to said central processor, and said multiplexing processing means capable of receiving data from said central processor and transmitting it to said playing means.

3

4    (Troy Patent, Claim 22.)  Furthermore, according to Troy, the multiplexer/preprocessor would

5    have "a RAM . . . with sufficient storage for operation and to store data for retransmissions

6    between the player console 100 and the central processor 144."  (*Id.* at Col. 6:50-53.)

7         The Court finds a genuine issue of material fact as to whether the multiplexer disclosed in

8    Troy has a transformational function or is in fact a separate tier equivalent to the master processing

9    unit disclosed in the '035 Patent.  As such, the Court denies MGAM's motion for summary

10   judgment of invalidity as anticipated by Troy on this basis.  *See Celeritas Techs.,* 150 F.3d at 1361

11   ("It is well settled that a claim is anticipated if each and every limitation [of the claim] is found

12   either expressly or inherently in a single prior art reference.")

13                    **2.    Finite Pool of Game Plays**

14        Claim 1(b), as construed by this Court, requires a "memory device operative to store at

15   least one finite pool [determinable complete set] of game plays, each finite pool containing a

16   predefined [defined in advance] number of winning and [losing] play records."[25]  ('035 Patent,

17   Claim 1; *see also* Order at 6.)  Gamco contends that Troy does not employ determinable complete

18   sets of game plays, but rather an open-ended pool with an infinite number of game plays.  Ms.

19   Spielman explains:

20        The game plays in Troy are created in a register counter.  This is referenced in Figure 6, boxes 300 and 304, of Troy.  The register counter incrementing continues for each game play.  The nature of using a register, common to anyone with ordinary skill in the art, indicates that the repeating of numbers will roll over when the register overflows.  As a simple example, if a register was meant to hold 9999 values, after the value 9999, the next value will be 0 and the incrementing will repeat.  Therefore, the use of a register for game play pools is, by its definition, infinite and does not constitute a finite pool of game plays as defined in the claims of the '035 Patent because there is no limit imposed on how many times the register overflows.

21

22

23

24

25   (Spielman Decl. ISO Invalidity Opp., ¶ 12; *see also id.*, ¶ 13.)

26        MGAM disputes that the use of a register counter does not create an infinite pool of lottery

27   tickets as Gamco contends.  The Troy patent discloses the use of "pools" in connection with its

28

_____

[25] This same limitation is an element of claims 1(a), 15(a), 15(b), 16(a), 18(a) and 18(b).  (*See generally* '035 Patent.)

04cv1053

1   instant lottery game system.  (*See* Troy Patent, Col. 18:56-58, Col. 23:4-7.)  Mr. Friedman asserts

2   that instant lottery pools are, by definition, finite pools.  (*See* Friedman Decl. ISO Invalidity Reply,

3   ¶ 12-16.)  The register counter is not this "pool," but works with the pool to identify the next ticket

4   to be played.  (Troy Patent, Col. 23:4-7.)  After the ticket pool is played in its entirety, the register

5   then allows the ticket pool to be restarted and played through again.  Thus, the register allows the

6   same pool to be *used* an infinite number of times, but does not create an infinite ticket pool insofar

7   as it does not create new or additional tickets.  (*See* Friedman Decl. ISO Invalidity Reply, ¶¶ 16-

8   17.)  Accordingly, MGAM contends that Troy discloses the use of a determinable complete set of

9   electronic game plays.

10          Based on this evidence before the Court, the Court finds a genuine issue of material fact as

11  to whether Troy discloses a complete determinable set of game plays despite the use of the register

12  counter and thus meets this limitation of the '035 Patent.  As such, the Court denies MGAM's

13  motion for summary judgment of invalidity on this ground, as well.

14          **D.      Koza**

15          Turning to Koza, the Court also finds a genuine issue of material fact as to whether Koza

16  meets the requirement of a three-tiered distribution system as disclosed in the '035 Patent

17  sufficient to defeat summary judgment of invalidity as anticipated by Koza.

18          Instead of a three-tiered system, Gamco contends that Troy discloses a two tiered system;

19  the first tier is the central controller and the second tier is the remote terminal, which is comprised

20  of both the game controller and the terminal controller.[26]  To the contrary, MGAM contends that

21  the game controller and the terminal controller are separate tiers with independent functions.  The

22  patent claims and specification support both interpretations sufficient to defeat summary judgment.

23          Claim 1 of Koza states: "In a gaming system having a central controller and a plurality of

24

25          [26]  Gamco further contends that this two-tiered structure not only brings Koza outside the
    bounds of Claim 18, but Claims 1, 15, and 16 and their dependant claims as well.  "For example,
26  because the game plays in the Koza system reside on the remote terminals and not on an intermediate
    third tier as disclosed in the '035 Patent and in the MGAM System, players are prevented from
27  competing with one another over common pools of tickets."  (Opp. to Invalidity MSJ at 16 (citing
    Spielman Decl. ISO Invalidity Opp., ¶ 21.)  "Furthermore, because the game plays already reside at
28  the lowest tier of the system, there is no need for game play requests or game play records to be
    transmitted across various tiers of the system as required by claims 1(d) and 1(e) of the '035 Patent.
    (*Id.*)

remote terminals each operable for playing a game. . ." (Passarelli Decl. ISO Opps., Ex. S (hereinafter "Koza Patent") at 24:52-54.) The claims go on to disclose the requirements of the "central controller" and the "remote terminals" or "terminals," but do not specifically distinguish or describe the game controller and the terminal controller. The game controller and terminal controller are discussed only within the specification. Further, Gamco relies in large part on the fact that the game controller and the terminal controller reside in the same box, i.e. the remote terminal. (*See* Spielman Decl. ISO Invalidity Opp., ¶ 19, 20; *see also* Koza Patent, Figures 1, 2 and 3A.)

MGAM, however, contends that the specification describes that game controller and terminal controller as having two different functions.[27] Specifically, MGAM argues that the terminal controller receives the mini-pools from the central computer and distributes game play records from those mini-pools (*see* Koza Patent, Fig. 3A, Box 70 and Col. 6:19-34), whereas the game controller requests and receives the game play records from the terminal controller and displays those records to multiple player terminals simultaneously (*see id.*, Fig. 3A, Box 50, Col. 4:2-52, Col. 3:32-39; *see also id.* Col. 6:19-20 (describing the terminal controller as a "separate, secure unit within the remote terminal housing").)

As such, given the claim language and specification of the Koza patent and Ms. Spielman's opinion as supported by Koza that it discloses a two-tiered system, the Court finds a genuine issue of material fact as to whether Koza discloses a two-tier or a three-tier distributed system. Thus, the Court denies MGAM's motion for summary judgment of invalidity based on anticipation by Koza.[28]

---

[27] Further, MGAM contends that Gamco's argument that because the two controllers reside in the same box, this indicates a single tier, is undercut by Ms. Spielman's assertion that all three tiers could reside on the same machine. (*See* Bjurstrom Decl. ISO Invalidity Reply, Ex. X at 36:2-10.) This is not dispositive. While Ms. Spielman's testimony regarding the Koza patent may be undermined by her other testimony, the Court does not weigh evidence nor make credibility determinations at this stage in the litigation. Thus, the Court will not discredit Ms. Spielman's testimony regarding her interpretation of the Koza patent and her opinion that it discloses a two-tier system.

[28] Furthermore, whether several other claim limitations of the '035 Patent are met by Koza rely on whether Koza discloses a two-tiered or a three-tiered distributed system and the communications between these purported tiers. (*See* Opp. to Invalidity MSJ at 16-18.) As such, to the extent the other claim limitations rely on this tiered system as argued by Gamco and recognized by MGAM in its

**VI.     Invalid as Obvious**

In the alternative, MGAM contends that the '035 Patent is invalid as obvious under 35 U.S.C. § 103.

**A.     Legal Standard**

35 U.S.C. § 103 provides that a patent may be invalid if it is "obvious":

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a).

To determine whether a patent is "obvious," courts look to the following factors: (1) the scope and content of prior art; (2) the differences between the prior art and the claims; (3) the level of ordinary skill in the art; and (4) second or objective evidence of non-obviousness, such as commercial success and satisfaction of long-felt need. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1996); *see also Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1376-79 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 974 (2001).

**B.     Analysis**

In its motion papers, MGAM did not distinguish its invalidity arguments based on the separate theories of anticipation and obviousness, instead electing to argue them together. However, Mr. Friedman's declaration submitted in support of the motion for summary judgment of invalidity does address the standards separately and he set forth his opinion as to whether certain differences between the '035 Patent and the prior art references of Troy, Koza, and industry knowledge of paper pull-tab games would be obvious to a person of ordinary skill in the art. MGAM has the burden of proving invalidity based on obviousness. The Court finds a genuine issue of material fact as to whether the '035 Patent is invalid as obvious.[29] Specifically, Gamco

_____

reply, the Court would find genuine issues of material fact as to these claim limitations, as well.

[29] Furthermore, there is fundamental dispute as to who constitutes a person of ordinary skill in the art. Mr. Friedman's opinion as to what a person of ordinary skill in the art differs greatly from Ms. Spielman's, yet both of their opinions based on obviousness relies on this person of ordinary skill in the art. Mr. Friedman opines that a person of ordinary skill in the art at the time of the '035 Patent would have an understanding of paper pull-tab games, an understanding of distributed computing, and

has offered evidence of secondary considerations which the Court may consider in evaluating

obviousness, yet there is a genuine issue regarding these secondary considerations sufficient to

preclude a determination by this Court that the '035 Patent is invalid as obvious as a matter of

law.[30]  *See Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000) ("[S]econdary

considerations, when present, must be considered in determining obviousness.").  These

considerations include "commercial success, long felt but unsolved needs, [and] failure of others."

*Ecolochem, Inc. v. Southern CA Edison Co.*, 227 F.3d 1361, 1376 (Fed. Cir. 2000).  Such evidence

of these secondary considerations may give rise to genuine issues of material fact and preclude

summary judgment of obviousness.  *Id.*; *see also Pro-Mold and Tool Co. v. Great Lakes Plastics,*

*Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996).

In its opposition, Gamco submits evidence, "particularly with regard to the commercial

success of the '035 Patent," which the Court finds precludes summary judgment of invalidity due

to obviousness.  *See Ecolochem, Inc. v. Southern CA Edison Co.*, 227 F.3d 1361, 1376 (Fed. Cir.

2000) (finding that evidence of secondary consideration such as "commercial success, long felt but

unsolved needs, [and] failure of others" may give rise to genuine issues of material fact and

preclude summary judgment of obviousness); *see also Pro-Mold and Tool Co. v. Great Lakes*

*Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996).  Specifically, Gamco submits evidence of

placements in Native American jurisdictions, royalties paid by Bally for development of a system

using the '035 Patent, a license purchased by Bally concerning products using the '035 Patent, and

a purchase agreement which included the '035 Patent between Gamco and IGT.[31]  (*See* Opp. to

---

3 to 5 years experience in the gaming industry**.**  (*See* Friedman Decl. ISO Invalidity MSJ, ¶ 11.)  Ms. Spielman, however, asserts that gaming experience may be helpful, but is not necessary.  (*See* Spielman Decl. ISO Opp. to Invalidity MSJ, ¶ 4.)  Considering this Court has found Ms. Spielman qualified as an expert despite this lack of experience, Mr. Friedman's opinions related to what one of ordinary skill in the art would consider obvious renders his opinions concerning obviousness in dispute.

[30]  Notably, MGAM did not even address relevant secondary considerations in its opening motion, nor specifically address the factors generally considered by the Court.

[31]  To this, MGAM generally disputes the commercial success based on Native American placements, asserting that this was in fact a "catastrophic failure."  (*See* Reply ISO Invalidity MSJ at 9; *see also* Bjurstrom Decl. ISO Reply, Ex. C. at 51-64.)  Moreover, MGAM contend that these gaming systems placed did not draw from the complete set of tickets but from subsets, like in Troy and Koza.  Thus, "the required nexus for establishing commercial success is lacking."  (Reply ISO

1  Invalidity MSJ at 23-25.)  As such, the Court finds a genuine issue of material fact as to the

2  relevant commercial success as an indication of non-obviousness sufficient to defeat summary

3  judgment and therefore denies MGAM's motion for summary judgment of invalidity based on the

4  theory of obviousness.

5  **CONCLUSION**

6  For those reasons, the Court **GRANTS** Multimedia Games, Inc.'s ("MGAM") motion for

7  summary judgment of non-infringement and **DENIES** MGAM's motion for summary judgment of

8  invalidity.

9

10

11

12  DATED:  August 11, 2010

13  *Janis L. Sammartino*
   Honorable Janis L. Sammartino

14  United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Invalidity MSJ at 10.)  Neither of these arguments defeat the genuine issue created by Gamco's
evidence of secondary considerations.